**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DEBRA MAZEIKA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 05 C 415** |
| ) | |
| **ARCHITECTURAL SPECIALTY PRODUCTS,** ) | **Judge Rebecca R. Pallmeyer** |
| **INC., PATRICK WALSH, and RENEE** ) | |
| **WALSH,** ) | |
| ) | |
| **Defendants.** ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

On April 27, 2004, Plaintiff Debra Mazeika, an employee of Architectural Speciality Products,

Inc. ("ASP"), had an odd encounter with a co-worker and his wife, during which she learned that

her co-worker had falsely told his wife he had a sexual relationship with Plaintiff. A month later,

Plaintiff was terminated from her accounting job at ASP. On January 24, 2005, she filed a thirteen-

count complaint against ASP; Patrick Walsh ("Patrick"), her co-worker at ASP; and Patrick's wife,

Renata Walsh. Against ASP, Plaintiff seeks damages for sex discrimination in violation of Title VII

of the Civil Rights Act of 1964 (Count I), sexual harassment/hostile work environment (Count II),

retaliation in violation of Title VII (Count III), intentional infliction of emotional distress (Count IV),

and violation of the Employee Retirement and Income Security Act, ("ERISA"), 29 U.S.C. § 1132

et seq. (Count V). Against the Walsh Defendants, Plaintiff seeks damages for intentional infliction

of emotional distress (Counts VII and XII), negligent infliction of emotional distress (Counts VIII and

XIII), defamation (Counts IX and X), and assault (Count XI, against Renata only). In an order dated

July 26, 2005, the court dismissed a state law defamation claim against ASP (Count IV). All three

Defendants now move this court for summary judgment on the twelve remaining counts of Plaintiff's

complaint. For the reasons explained below, Defendant ASP's motion for summary judgment is

granted as to Counts I, II, III, and V. Plaintiff's state law claims (Counts IV, VII, VIII, IX, X, XI, XII,

and XIII) are dismissed without prejudice. Plaintiff's Motion to Strike Defendant ASP's

Affidavits/Declarations of Rena Jahn and Loren Jahn is granted in part and denied in part.[1]

## FACTUAL BACKGROUND

The relevant facts, based upon the parties' Local Rule 56.1 statements and attachments, are as follows.

### A. Plaintiff's Employment at ASP

Plaintiff Debra Mazeika is a former employee of ASP, an Illinois company owned by Rena Jahn and Loren Jahn. (ASP LR 56.1 Stmt. ¶ 2; Pl.'s LR 56.1 Stmt. ¶ 4.)[2] ASP manufactures "custom metal panels" for industrial clients and employs a small office staff in addition to its manufacturing-plant personnel. (R. Jahn Dep. at 14–16.) Rena serves as president and Loren as vice president and corporate secretary. (ASP LR 56.1 Stmt. ¶¶ 7-8.) As corporate secretary, Loren, a CPA, was responsible for handling administration, banking relationships, funding, and insurance. (Pl. LR 56.1 Stmt. ¶ 5.)[3]

---

[1] In a Motion to Strike Defendant ASP's Affidavits/Declarations of Rena Jahn and Loren Jahn ("Plaintiff's Motion to Strike"), Plaintiff asks the court to strike a number of Defendant's submissions, including those portions of the sworn declarations of Rena and Loren Jahn that contradict their sworn deposition testimony. (Pl. Mot. to Strike at 3-7.) To the extent that a dispute between a declaration and deposition testimony is relevant to the facts discussed here for summary judgment purposes, the court notes its rulings on Plaintiff's Motion to Strike herein. To the extent that issues raised in Plaintiff's Motion to Strike are not relevant here, Plaintiff's Motion to Strike is denied as moot. As a preliminary matter, Plaintiff argues that the court should strike both declarations in their entirety because they are not properly notarized. (*Id.* at 9-10.) This objection is overruled. *See* 28 U.S.C. § 1746 (authorizing unsworn affidavits that are declared as true "under penalty of perjury," signed, and dated). Plaintiff cites *Cornelius v. Hondo, Inc.,* (Pl. Reply Mem. at 4-5), but the court in this case did not strike the disputed affidavit because it was not notarized; rather, the court noted that the affidavit did not even meet the requirements of 28 U.S.C. § 1746 as it was not dated when signed, and the language "under penalty of perjury" did not appear on the affidavit. *See* 843 F. Supp. 1243, 1247-48 (N.D. Ill. 1994).

[2] The court refers to the Jahns by their first names to avoid confusion.

[3] Plaintiff moves to strike Loren's declaration that he is the "Corporate Secretary/Treasurer" of ASP, (L. Jahn Decl. ¶ 1), because it is contradicted by Loren's deposition testimony that his position is "Corporate Secretary," (L. Jahn Dep. at 10). (Pl. Mot. to Strike at 3-4.) Such an obligation is unfortunate; Plaintiff has admitted that Loren was the "secretary/treasurer" in both her deposition and her statement of material facts. (Mazeika Dep. at 22; Pl. LR 56.1 ¶ 3.)

(continued...)

On or about July 6, 1998, Plaintiff was hired as an accountant by Loren and Scotty Scollon, ASP's general manager. (Pl. LR 56.1 Stmt. ¶ 1–3; ASP's LR 56.1 Stmt. ¶¶ 9, 10.) Plaintiff's starting salary was $36,000 and she initially reported to Mr. Scollon. (R. Jahn Dep. at 53; ASP's LR 56.1 Stmt. ¶ 10.) The parties agree that Plaintiff performed basic accounting duties, including accounts payable/receivable, (ASP LR 56.1 Stmt. ¶ 9; Pl.'s LR 56.1 Stmt. ¶ 13), but they dispute the scope of her duties beyond these accounting functions.[4] According to ASP, Mazeika was not responsible for "profit and loss, the hiring and firing of employees, or conducting performance reviews of employees." (ASP LR 56.1 Stmt. ¶ 11.) Plaintiff disagrees and claims that, together with Yoksas, she hired employees.[5] (Pl. LR 56.1 Stmt. ¶ 11.)[6] Plaintiff claims that she and two other employees, Warren Yoksas and Defendant Patrick Walsh,[7] formed a three-person team that "ran the company for the offsite owners, doing whatever was necessary to keep the doors open and the company moving ahead." (Pl. LR 56.1 Stmt. ¶ 8.)[8] Plaintiff describes her role on the team, in

---

[3](...continued)
The court presumes that Loren's omission of "treasurer" in deposition was inadvertent. In any event, any dispute concerning Loren's job title is not material. Plaintiff's motion to strike this portion of Loren's declaration is denied.

[4]      Plaintiff moves to strike both Loren and Rena's declarations regarding Plaintiff's job duties, (L. Jahn Decl. ¶ 12; R. Jahn Decl. ¶ 6), arguing that the Jahns describe Plaintiff job duties more expansively in their depositions than they did in their declarations. (Pl. Mot. to Strike at 4-5.) Neither declaration purports to present a comprehensive list of Plaintiff's job duties, however, and the court declines to strike them on that basis.

[5]      In deposition, Yoksas was not asked nor did he discuss whether he and Plaintiff hired new employees together.

[6]      Plaintiff also denies ASP's statement that she was not responsible for profit and loss, firing employees, or reviewing the performance of employees. (Pl. LR 56.1 Resp. (ASP) ¶ 11.) The facts to which Plaintiff cites to support her denial, (Pl. LR 56.1 Stmt. ¶ 6, 8-9, 11, 15), do not address Plaintiff's responsibility for these specific functions.

[7]      To avoid confusion, the court will refer to Defendant Patrick Walsh and Defendant Renata Walsh by their first names.

[8]      Generally, neither Rena nor Loren are in ASP's offices every day of the week. (R.
(continued...)

3

addition to accounting, as that of office manager, and in that role she "sat in on disciplinary actions." (*Id.* ¶¶ 10, 15.) Indeed, Plaintiff describes herself as the head of the accounting and human resources ("HR") department at ASP. (*Id.* ¶ 12.) Although ASP admits that Plaintiff performed certain HR duties in addition to her accounting duties, (ASP LR 56.1 Resp. ¶ 16), ASP maintains that she acted in both capacities only at Loren's and Rena's direction and denies that Plaintiff had any management responsibilities. (*Id.* ¶ 12; R. Jahn 2nd Decl. ¶¶ 2–3.) According to ASP, Plaintiff, Patrick, and Yoksas did not "run the company"; they each performed distinct roles and the Jahns were the ultimate decision-makers. (R. Jahn 2nd Decl. ¶¶ 2–3; *see also* Yoksas Dep. at 19) (testifying that when Rena and Loren were not present, Plaintiff, Patrick, and Yoksas were "in charge of day-to-day operations.").

In December 1999, ASP fired Scollon. (*See* R. Jahn Dep. at 9; R. Jahn Decl. ¶ 32.) Plaintiff testified that, shortly before Scollon was fired, Loren informed her that Scollon's termination was planned, and Plaintiff asked Loren who was going to take over Scollon's position. (Pl. LR 56.1 Stmt. ¶ 17; Mazeika Dep. at 38.) According to Plaintiff, Loren responded, "what's the difference, you already do his job." (*Id.*) Plaintiff also testified about a subsequent conversation with Loren, after Scollon had left, during which Plaintiff asked whether she could work her way up to Scollon's salary range, and Loren responded affirmatively. (Pl's LR 56.1 Stmt. ¶ 18; Mazeika Dep. at 79.) Citing only Loren's Second Declaration, ASP denies that either conversation took place. (ASP LR 56.1 Resp. ¶¶ 17–18.)[9] In any event, Plaintiff maintains that after Scollon left the company she performed "all" the duties that he had performed as general manager and "[ran] the company for

---

[8](...continued)
Jahn Dep. at 20; L. Jahn Dep. at 14.) Plaintiff contends that they spent a bit less time in the office, (Pl.'s LR 56.1 Stmt. ¶ 22), and the court previously determined the Walsh Defendants are deemed to have admitted certain portions of Plaintiff's Joint Statement of Additional Facts, including this one. (Pl.'s LR 56.1 Stmt. ¶ 22; 3/21/06 Order.)

[9]     Loren Jahn was not asked about this conversation nor did he testify about it in his deposition.

the Jahns who were not there" though she admits she does not know what all of his responsibilities were. (Pl. LR 56.1 Stmt. ¶ 20; Mazeika Dep. at 40–41, 44) (testifying that she performed "some" of Scollon's duties). ASP admits that Plaintiff did perform some of Scollon's tasks after he was fired, including: processing payroll, for a third party payroll service, a largely ministerial task (ASP LR 56.1 Resp. ¶ 26); fielding applications for new employees (Pl. LR 56.1 Stmt. ¶ 28); processing employee insurance benefits (*Id.* ¶ 29); and prioritizing and paying ASP's bills (*Id.* ¶ 31). But ASP contends that these were basic functions, (ASP LR 56.1 Stmt. ¶ 72), and that Plaintiff did not perform Scollon's broader responsibilities as General Manager, including "authority over virtually all day-to-day decisions." (*Id.* ¶¶ 11, 68.) According to ASP, Rena, not Plaintiff, assumed these broader responsibilities after ASP fired Scollon. (ASP LR 56.1 Resp. ¶ 21; R. Jahn Dep. at 9–10) (testifying that she "assumed the general manager role" after Scollon's termination).

When Scollon left the company, he had been General Manager for four years and Plaintiff estimates (presumably based on her experience with ASP's payroll) that he was earning approximately $72,000.00 per year.[10] (Pl. LR 56.1 Stmt. ¶ 202.) According to ASP, though, Scollon's relatively high salary is deceptive. First, the Jahns did not initially set his salary: Scollon was already employed by the company when the Jahns purchased ASP from its previous owners in 1997. (ASP LR 56.1 Stmt. ¶¶ 69–70.) After they purchased ASP, the Jahns reduced his salary by $19,225. (*Id.* ¶ 71). According to the Defendants, Scollons' high salary was the reason for his discharge. (R. Jahn Dec. ¶ 12.) Plaintiff denies this, but the only evidence she cites is her testimony that "[a]fter Scotty was gone probably," Loren told Plaintiff that the company would save money on its employee health insurance because Scollon and another employee, both of whom had heart problems, were no longer with the company. (Mazeika Dep. at 66.) The fact, if true, that Scollon's termination decreased ASP's health insurance premium is not inconsistent with ASP's

---

[10]        Scollon's actual salary is not in the record.

assertion that it fired Scollon to save ASP money. Moreover, it is undisputed that ASP significantly downsized its workforce in the years leading up to Plaintiff's termination. (Pl. LR 56.1 Resp. (ASP) ¶ 17.) Plaintiff herself contends that Scollon was fired because his position was "redundant," as Plaintiff already performed his job. (*Id.* ¶ 20.) ASP denies that Loren made the statement Plaintiff cites as evidence for this assertion, (ASP LR 56.1 Resp. ¶ 17), but in any event, the notion that ASP did not need Scollon's services is consistent with ASP's assertion that Scollon earned too much money. (ASP LR 56.1 Stmt. ¶ 70.)

The parties also dispute the scope of other employees' responsibilities at ASP. Specifically, Plaintiff maintains that the two other members of the three-person team that "ran the company," Patrick and Yoksas, were paid more that she was even though they shared the same level of responsibility as Plaintiff. (Mazeika Dep. at 79.)[11] It is undisputed, however, that each employee performed a distinct function. (Pl. LR 56.1 Resp. (ASP) ¶ 75.) Patrick, ASP's "Project Manager," performed more technical functions for the company (e.g., "reviewing and approving material requisitions" and "providing technical assistance for sale [sic] and customers"). (*Id.* ¶ 76.) Yoksas, ASP's "Estimating/Sales Manager," created project estimates and liaised with the company's clients. (*Id.* ¶ 77.) Plaintiff acknowledged that she did not have the training to perform either Patrick's or Yoksas's job. (Mazeika Dep. at 82–85.) According to ASP, Walsh and Yoksas were paid more because their "specialized expertise" was more valuable to the company, whereas Plaintiff's basic accounting skills were fungible. (R. Jahn Decl. ¶¶ 21–22; L Jahn Decl. ¶ 11.)

When Plaintiff was fired in May 2004, she was earning $45,000 a year. (R. Jahn Dep. at

---

[11] The Walsh Defendants have admitted that Yoksas, Walsh, and Plaintiff were members of a three-person team that ran the company for the Jahns, "doing whatever was necessary to keep the doors open and the company moving ahead." (Pl. LR 56.1 Stmt. ¶¶ 8, 175; 3/21/06 Order.)

85.)[12] Yoksas' starting salary in 1996 was approximately $40,000 a year; by 2005, he was earning $55,000 a year. (Yoksas Dep. at 8.) Patrick began working at ASP in December of 1999 making 58,000; he testified that he had been making $57,000 at his previous job, and in his job interview with Loren and Mr. Scollon requested "at least . . . a lateral move if not more money." (P. Walsh Dep. at 160). In 2001, however, Patrick's pay was reduced by $10,000 when he made a mistake that cost the company money. (*Id.* at 14, 160–61.) Then in or around 2003, ASP resumed paying Patrick $58,000 per year. (*Id.*)

The parties also dispute Patrick's managerial responsibility at ASP. Plaintiff testified that Patrick had the authority to hire and fire plant employees, (Pl. LR 56.1 Stmt. ¶ 38; Mazeika Dep. at 26, 255), and that Patrick and another employee, Rubin Navarro, recommended salaries for new plant employees. (*Id.* ¶ 39.) ASP denies that Patrick had any authority to hire plant employees or played any role in setting their salaries. (ASP LR 56.1 Resp. ¶¶ 38–39.) Plaintiff claims that, as Project Manager, Patrick supervised and controlled his "department," which included Navarro, the shop foreman, and other plant employees. (Pl. LR 56.1 Stmt. ¶¶ 40–41, 43.)[13] ASP contends that Walsh's "department" consisted of himself and, in part, a draftsman, and that Walsh managed plant employees only if Navarro—who occupied the same level on ASP's organizational chart—was on vacation. (ASP LR 56.1 Resp. ¶¶ 40–42.) Plaintiff further claims that Patrick was able to give her instructions, a fact that Patrick admits while maintaining that he and Plaintiff nevertheless

---

[12]    Rena testified that over the course of Plaintiff's employment at ASP, her salary increased from $36,000 to $40,000, then $40,000 to $45,000, although she could not recall precisely when Plaintiff received those raises. (R. Jahn Dep. at 53–54.)

[13]    The Walsh Defendants are deemed to have admitted Plaintiff's assertions that Patrick managed projects and people, including Rubin Navarro, shop foreman, and all nine plant employees, that Patrick could set the direction and control of his own department, that Patrick supervised the employees he hired, and that Patrick was higher than Navarro on the organizational chart, thus the shop employees that reported to Navarro could go directly to Patrick. (Pl. LR 56.1 Stmt. ¶¶ 40-43; 3/21/06 Order.)

functioned on the same level. (Walsh LR 56.1 Resp. ¶ 7.) The Jahns both denied that Patrick had

authority to give Plaintiff instructions. (R. Jahn 2nd Decl. ¶ 1; L. Jahn 2nd Decl. ¶ 1.)

**B.      Incident Between Walsh Defendants and Plaintiff**

Several of Plaintiff's claims in this lawsuit grow out of an incident that occurred on April 27,

2004, involving Defendants Patrick Walsh and Renata Walsh, his wife. Prior to the incident, Plaintiff

had spoken to Renata on several occasions over the phone when Renata called to speak with her

husband. (Pl. LR 56.1 Stmt. ¶ 45.) Although Plaintiff and the Walsh Defendants give conflicting

accounts about how cordial those interactions were, (*Id.* ¶¶ 45–48; R. Walsh Dep. 38-39), it is

undisputed that Plaintiff's and Renata's interaction was limited. (Pl. LR 56.1 Stmt. ¶¶ 45–48.)

Then, on April 27, 2004, Renata visited ASP's office and sought Plaintiff out in her office. (Walsh

LR 56.1 Stmt. ¶¶ 21–23.) The parties dispute whether the tone of the encounter was initially

confrontational, (Pl. LR 56.1 Stmt. ¶ 53; Walsh LR 56.1 Resp. ¶ 54), but agree that at Renata's

request, Plaintiff called Patrick from her office to let him know that he had a "visitor," and that

Patrick stated that he would "be right there." (Pl. LR 56.1 Stmt. ¶ 56.)

While Patrick was en route, Plaintiff spilled coffee and excused herself to use the washroom.

(*Id.* ¶¶ 59–60.) When she returned, Patrick was in her office, leaning against a file cabinet in front

of Plaintiff's desk, and Plaintiff proceeded to sit down at her desk. (*Id.* ¶¶ 61, 63.) Plaintiff testified

that Mrs. Walsh then asked her husband, in Plaintiff's presence, "[w]hat did you say to me last

night?", (Mazeika Dep. at 101), and that he responded, "I said I was fucking her." (*Id.*) In the

accounts of the Walsh Defendants, Patrick volunteered to Plaintiff, "Do you want to tell my wife

nothing is going on?" and Renata then repeated an assertion Patrick had made to her previously,

that he had had an affair with Plaintiff. (P. Walsh Dep. at 80, 82-83; R. Walsh Dep. at 45-46, 65-

66.) Even in Plaintiff's account, though, Patrick made only one statement during the conversation.

(Mazeika Dep. at 101-102, 104, 234.) The parties all agree that the statement was untrue and that

Patrick and Plaintiff did not have a sexual or romantic relationship. (Walsh LR 56.1 Resp. ¶¶

67–69.) Plaintiff denied Renata's allegation, (Pl. LR 56.1 Stmt. ¶¶ 70–71), and testified that as she tried to convince Renata that she was not involved in an affair with Patrick, Renata "kept leaning on Plaintiff's desk." (*Id.* ¶¶ 71–73.) Renata, for her part, denies that she ever leaned over the desk and claims that Plaintiff was not within her reach from where she was sitting. (R. Walsh Dep. at 100.) Plaintiff testified that she felt trapped and threatened, though she testified that the volume of the conversation was "normal" and acknowledged that she never asked Renata or Patrick to leave. (Pl. LR 56.1 Stmt. ¶¶ 80, 82.) The parties disagree on the length of this conversation. Plaintiff claims it lasted for 45 minutes, (*id.* ¶ 80), while Renata claims it was just five minutes long. (Walsh LR 56.1 Resp. ¶ 81.) Another ASP employee, Robert Grousnick, witnessed the incident through the glass walls of Plaintiff's office, and heard voices but he "couldn't make anything out" that was actually said during the conversation. (Grousnick Dep. at 21–24, 37.) No other ASP employee testified to having heard the conversation. According to Mr. Grousnick, the incident lasted "maybe" 20 or 25 minutes. (*Id.* at 45.) It is undisputed that the conversation in Plaintiff's office ended when Plaintiff stated that she needed a cigarette and offered to Renata, and possibly Patrick, that they could continue the conversation outside. (Pl. LR 56.1 Stmt. ¶ 79.) Neither of the Walshes did anything to prevent Plaintiff from leaving the room or otherwise obstruct her exit. (Pl. LR 56.1 Resp. (Walsh) ¶ 55; Mazeika Dep. at 105.)

Either before or after Plaintiff left the room—Plaintiff claims both Defendants were in her office when she left, whereas Renata claims Patrick left first—Patrick was summoned by another employee to another part of the plant. (Pl. LR 56.1 Stmt. ¶¶ 83–84.) Renata, meanwhile, followed Plaintiff outside the building, where Plaintiff was smoking a cigarette and crying. (*Id.* ¶ 79, 86.) At this point, the parties' description of events again diverge. Plaintiff claims that Renata insisted on continuing the conversation about Patrick (*id.* ¶ 86); Renata claims that Plaintiff stated that she was upset about her workload and denies that there was any further conversation about Patrick. (Walsh LR 56.1 Resp. ¶ 86; R. Walsh Dep. at 78–79.) Plaintiff recalls that Renata was standing at arms

length away, which was "too close . . . for comfort," (Pl. LR 56.1 Stmt. ¶ 88), while Renata claims she was standing approximately five feet from Plaintiff so as to avoid Plaintiff's cigarette smoke. (R. Walsh Dep. at 77.)  According to Plaintiff, the conversation continued after Renata followed Plaintiff back into the building. (Pl. LR 56.1 Stmt. ¶¶ 90, 92.)  Renata claims that she returned to the office first, to look for Patrick, and that the conversation ended at that point.  (R. Walsh Dep. at 80-81.)  Renata retrieved her purse from Plaintiff's office, either at Plaintiff's invitation (Renata's account) or on her own (Plaintiff's account), at which point Plaintiff claims Renata made one final statement about her husband—words to the effect of "is that my husband?"—as Plaintiff answered her phone.  (Pl. LR 56.1 Stmt. ¶¶ 91–94.)  According to Mr. Grousnick, who observed Plaintiff after she returned to her office, Plaintiff "didn't look upset, but she was shuffling a lot of papers around very quickly."  (Grousnick Dep. at 30–31.)  This ended the incident and neither Patrick nor Renata discussed the incident or raised the subject with Plaintiff again.  (Mazeika Dep. at 141, 234.)  Plaintiff admits that, in the course of these events, Renata never told Plaintiff she was going to hurt or touch her, and that Renata never did hurt or touch Plaintiff.  (Pl. LR 56.1 Resp. (Walsh) ¶¶ 67-68.)

After Renata left Plaintiff's office, Plaintiff called Loren and told him about the confrontation. (ASP LR 56.1 Stmt. ¶ 62.)  Plaintiff claims that she told Loren the "whole story" of "everything that happened," including "what both Patrick and Renata said" to her.  (Pl. LR 56.1 ¶ 121; Mazeika Dep. at 119-20.)  Loren claims that Plaintiff recounted that Renata came in and accused Plaintiff of having an affair with Patrick.  (ASP LR 56.1 Resp. ¶ 121.)  According to Loren, Plaintiff was "pretty hysterical" when she called him about the incident.  (L. Jahn Dep. at 57.)  Loren advised Plaintiff that she should leave the office for awhile; Plaintiff at first resisted, stating she had too much work to do, but eventually agreed and left the office to visit her father.  (*Id.* at 59-60)  She was gone for approximately one hour and fifteen minutes before returning.  (*Id.*)

Rena later sought Plaintiff out to determine if everything was okay.  (ASP LR 56.1 Stmt.

¶¶ 63–64; R. Jahn Decl. ¶ 53.)  According to Plaintiff, her meeting with Rena took place one or two days after the incident.  (Mazeika Dep. at 126–27.)  Rena claims she became aware of the incident when Plaintiff told her about it, and recalls the conversation occurring "[a] couple weeks after" the incident.  (R. Jahn Dep. at 98.)[14]  After Plaintiff told Rena about the confrontation, Rena advised Plaintiff to "immediately call the police" if Renata showed up at the office again.  (Mazeika Dep. at 128; R. Jahn Dep. at 102.)  According to Plaintiff, Rena spoke with Plaintiff again one or two days after this first conversation and told Plaintiff that she had a "sexual harassment case and that [Rena] would help [Plaintiff] with it," explaining to Plaintiff that sexual harassment "does not have to be only physical, it can be verbal."  (Pl. LR 56.1 Stmt. ¶ 130.)  During this second conversation, or "counseling" session, Plaintiff claims that Rena told her that "she would never put up with a single woman having an affair with a married man in her company."  (*Id.* ¶ 132.)[15]  Rena claims she only had one conversation with Plaintiff, denies making this statement, and denies ever discussing a potential "sexual harassment" claim with Plaintiff.  (ASP LR 56.1 Resp. ¶¶ 128-30, 132; R. Jahn Dep. at 102; R. Jahn 2nd Decl. ¶¶ 13–14.)[16]  ASP for its part, acknowledges that at a second meeting, Plaintiff told Rena that Plaintiff "did not want to get anybody in trouble, I don't want anybody fired, I just want everybody to keep their jobs and keep working."  (ASP LR 56.1 Resp. ¶ 131.)  Plaintiff testified that she felt uncomfortable working with Patrick after the confrontation with

---

[14]    Because Rena's testimony to this effect is inconsistent with her declaration, in which she asserts that the conversation occurred just one week after the incident, (R. Jahn Decl. ¶ 53), Plaintiff's motion to strike that portion of the declaration is granted.  (Pl. Mot. to Strike at 6.)

[15]    Noting that Rena testified to just one conversation about the incident with Plaintiff, Plaintiff moves to strike the reference in Rena's sworn declaration to having "conversations" with Plaintiff about it.  (R. Jahn Decl. ¶ 54; Pl. Mot. to Strike at 6.)  The court is puzzled by this motion; Plaintiff herself testified to the content of two conversations.  Nevertheless, because the declaration is inconsistent with the deposition testimony, the motion to strike is granted.

[16]    Plaintiff stated in her deposition that she spoke with Rena about the incident on three separate occasions, but she only testified about the content of two such conversations.  (*See* Mazeika Dep. at 128–29, 261–62.)

Renata as he did not talk to her at all and she "stayed away from him for a good week." (Mazeika Dep. at 141, 144.)[17] Plaintiff, however, did not recall in her deposition that Patrick had done anything to inhibit her work and stated she was able to persevere without further incident in the interests of the business. (*Id.* at 144–45.)

## C. ASP'S Decision to Terminate Plaintiff

ASP terminated Plaintiff on May 28, 2004, approximately one month after the April 27, 2004 confrontation with Renata. (Pl. LR 56.1 Stmt. ¶ 214; ASP LR 56.1 Stmt. ¶ 44.) Prior to that time, neither Rena nor Loren spoke with Patrick about what had happened and he was neither suspended nor disciplined. (ASP LR 56.1 Resp. ¶¶ 142, 148.) Patrick is still employed by ASP. (*Id.* ¶ 147.)

The Jahns assert that they made the decision to eliminate Plaintiff's position sometime in February or March of 2004. (*See* L. Jahn Dep. at 43; R. Jahn Decl. ¶ 34.)[18] At that time, they determined that ASP could save up to $20,000 a year by eliminating Plaintiff's accounting position (and her $45,000 salary), hiring a part-time accounts payable/receivable clerk, and having the Jahns assume any additional tasks then being performed by Plaintiff. (R. Jahn Decl. ¶ 34; *cf.* R. Jahn Dep. at 85) (putting the savings figure at approximately $15,000). As of 2004, ASP had experienced continuous financial difficulties since the Jahns purchased the company in 1997. According to the Jahns, they lost $1 million over that period of time—$400,000 in 2003 alone—and had downsized from approximately 40 employees, when they purchased the company, to 16 by the

---

[17] The Walsh Defendants are deemed to have admitted that after the April 27, 2004 incident, Patrick did not work with Plaintiff as a team player, and did not say hello or goodbye, as he did for five years, or apologize. (Pl. LR 56.1 Stmt. ¶ 151; 3/21/06 Order.)

[18] In her deposition, Rena testified that ASP made the decision to terminate Plaintiff in "late winter or early spring," a time frame wholly consistent with the March 2004 date she assigns to the decision in her declaration. (R. Jahn Decl. ¶ 34) Plaintiff's motion to strike this portion of the declaration is frivolous. (Pl. Mot. to Strike at 6.)

Spring of 2004 due to decreased business. (R. Jahn Decl. ¶¶ 28–29.)[19] ASP also notes that, prior to terminating Plaintiff, it had eliminated three positions in similar circumstances, distributing the terminated employee's responsibilities among remaining employees rather than bringing in additional people. (*Id.* ¶ 31.) Plaintiff contends that these employees, including Mr. Scollon, were eliminated for reasons (such as health and job performance) other than cost. (Pl. LR 56.1 Resp. (ASP) ¶¶ 20–21.) According to Plaintiff, ASP was aware that she had experienced health problems, including a lump in her breast, when ASP terminated her. (Pl. LR 56.1 Stmt. ¶ 210; Mazeika Dep. at 67.) Plaintiff does not specify who at ASP was aware of her health problems, and ASP denies having any knowledge of Plaintiff's health problems. (Mazeika Dep. at 67; ASP LR 56.1 Resp. ¶ 210.)

On April 15, 2004 (several days before the incident involving the Walshes), Rena posted an ad with the Moraine Valley Job Placement Center for an "Accounts Payable Clerk" position, starting at $26,000 a year. (ASP LR 56.1 Stmt. ¶ 33; Employment Ad, Ex. N to Pl.'s Joint Addendum of Exs. in Support of Her Opp'n to Defs.' Motions for Summ. J (hereinafter, "Pl.'s Addendum")). Plaintiff testified that she was aware, prior to the incident with Mr. and Mrs. Walsh, that ASP was looking for a part-time clerk. (Mazeika Dep. at 277.) She further testified that she did not believe ASP was creating the new position to replace her, a belief that appears to be based on the fact that the advertisement referred only to "accounts payable," which constituted only a portion of her accounting responsibilities. (*Id.* at 277–78.)

Towards the end of April or beginning of May 2004, the Jahns learned from their pastor that a parishioner at their church, Tim Gibbons, was looking for a job. (ASP LR 56.1 Stmt. ¶ 35; Gibbons Dep. at 39–40; L. Jahn Dep. at 79.) On or about April 30, 2004, ASP received a cover

---

[19] Plaintiff's motion to strike Rena's declaration that ASP had "approximately 40 employees," (R. Jahn Decl. ¶ 28) , as inconsistent with her deposition testimony that ASP had 35-40 employees at that time is, again, frivolous. (Pl. Mot. to Strike at 6.)

letter and resume from Mr. Gibbons, (ASP LR 56.1 Resp. ¶ 161), and ASP interviewed him sometime in mid-May. (Pl. LR 56.1 Stmt. ¶ 167.) During Gibbons' interview, Rena told him that initially they were looking for someone just to "take care of some of the clerking and the accounting stuff," but that because of his "experience," they had decided to form a new position ("Administrator") that would consolidate several other positions and help ASP cut costs. (Gibbons Dep. at 43; ASP's LR 56.1 Stmt. ¶ 38.) Specifically, the Jahns determined that, in addition to performing all of ASP's accounting and human resource functions, Mr. Gibbons could also perform: (1) payroll services (which were, at that time, being outsourced to a company called ADP for approximately $5,000 per year); and (2) technology maintenance (which Ms. Jahn believed would save approximately $12,000 annually) and development (e.g., developing ASP's website). (R. Jahn Decl. ¶¶ 41, 43.)[20] According to the Jahns, Plaintiff never performed these roles at ASP, and they had no reason to believe that she was capable of doing so. (Id. ¶ 42.)

For her part, Plaintiff contends that she offered on "at least three occasions" to perform payroll functions in-house, as she had done for previous employers, though Plaintiff does not indicate exactly where and when she made these offers. (Mazeika Aff. ¶¶ 1–8.) The Jahns declined her offers, and never, on their own initiative, asked Plaintiff to prepare payroll in-house. (Id. ¶¶ 4–5, 8.) Plaintiff further asserts that the Jahns never asked her to obtain additional IT training, even though she expressed her willingness to do so on "several occasions." (Id. ¶¶ 9–12.) Moreover, she did perform some non-technical IT functions. (Id. ¶ 14.) She also suggests that Loren somewhat overstates ASP's IT needs—according to Plaintiff, the "entire company had a total of around five computers, only three of which were used on a full time basis." (Id. ¶ 13.) It is

---

[20]    Plaintiff moves to strike Rena's declaration in which she states that ASP saved $20,000 per year by hiring Gibbons as inconsistent with her deposition testimony that estimates $15,000 savings per year after hiring Gibbons. (Pl. Mot. to Strike at 5.) Nowhere in Rena's declaration does she estimate savings of $20,000 per year as a result of Gibbon's hiring. Plaintiff's motion to strike this portion of the declaration is denied.

undisputed, however, that, during Plaintiff's employment at ASP, ASP paid an outside computer consultant for its networking needs, an outsourcing arrangement that ceased after Gibbon's employment with ASP. (L. Jahn Dep. at ¶¶ 94–95; R. Jahn Dep. at 159.)

Plaintiff also disputes Mr. Gibbons' qualifications. Plaintiff points out that Mr. Gibbons' computer proficiency was essentially self-taught. (Pl. LR 56.1 Stmt. ¶¶ 189, 197–98.) Plaintiff asserts that she was more qualified than Gibbons to perform ASP's accounting functions, pointing out that Mr. Gibbons' degree is in secondary education, whereas Plaintiff's degree is in business administration. (*Id.* ¶¶ 189–91.) Still, Gibbons himself had taught computer classes to middle-school children and had been the head of a school district's department of technology. (Gibbons Dep. at 11–12, 50.) His eventual responsibilities at ASP included administering the computer network, website development, software development, and "anything related to the network or technology" in the office. (*Id.* at 10-11.) Moreover, he possessed relevant experience working with payroll software. (Gibbons Resume, Ex. K to Pl.'s Addendum.) By contrast, Rena testified that Plaintiff's computing skills were deficient and that she made comments to that effect on Plaintiff's employee reviews. (R. Jahn Dep. at 122–25.)

In mid-May, ASP offered Mr. Gibbons the position and he accepted several days later. (Pl. LR 56.1 Stmt. ¶¶ 169-70; Gibbons Dep. at 45.) Rena told Plaintiff that her position was being eliminated on May 28, 2004, effective immediately. (ASP LR 56.1 Stmt. ¶ 44.) On June 1, 2004, the first business day following Plaintiff's last day at the firm, Tim Gibbons began work at ASP at a starting salary of $50,000. (Gibbons Dep. at 6, 45.) As of November 2005, Gibbons was earning $60,000 per year. (*Id.* at 6.)

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). It is Defendants' burden to establish that there is no genuine issue as to any material fact, and in ruling on Defendants' motions, the court draws all reasonable inferences in Plaintiff's favor. *Crim v. Board of Educ. of Cairo School Dist. No. 1*, 147 F.3d 535, 540 (7th Cir. 1998). Inferences supported only by speculation or conjecture will not defeat a motion for summary judgment. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (citation omitted).

### B.    Count I: Sexual Discrimination

A Title VII claim for sex discrimination "can survive summary judgment if the plaintiff presents either direct or circumstantial evidence of discrimination . . .or indirect evidence of discrimination" that satisfies the burden shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Phelan v. Cook County*, __ F.3d __, No. 04-3991, 2006 WL 2690986, *4 (7th Cir. 2006). Plaintiff has not addressed the direct method and, following her lead, the court addresses the indirect method here. (Pl. Opp'n (ASP) at 3.) To establish a *prima facie* case, Plaintiff must demonstrate that "(1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male employees." *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). If Plaintiff establishes a *prima facie* case, the "burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the challenged action." *Id.* Assuming the defendant can provide such a reason, Plaintiff "must establish that those proffered reasons were mere pretext." *Id.*

#### 1.    *Prima Facie* Case

ASP contends that Plaintiff cannot establish a *prima facie* case of discrimination. (ASP Mem. at 2–4.) ASP does not dispute that Plaintiff is a member of a protected class, was meeting ASP's legitimate performance expectations, and suffered an adverse employment action, but ASP argues that Plaintiff was not similarly situated to the male employees whom she contends ASP treated more favorably. *(Id.* at 2.) Plaintiff contends that she and Patrick were similarly situated and that ASP treated Patrick more favorably than Plaintiff after the April 27, 2004 incident. (Pl. Opp'n (ASP) at 4–6.) Plaintiff further argues, as evidence of sex discrimination, that she and each of four male employees (Scollon, Patrick, Yoksas, and Gibbons) were similarly situated, yet each of these employees received a higher salary. (*Id.* at 6–8.) The court will address each of these arguments in turn.

Plaintiff's argument that she and Patrick were similarly situated and ASP treated Patrick more favorably after the April 27, 2004 incident is unavailing. To prevail on her claim, Plaintiff must first show that she was similarly situated to Patrick. Plaintiff claims that she and Patrick were similarly situated by virtue of the fact that they were both involved in the incident that occurred on April 27, 2004. (*Id.* at 5.) Individuals are similarly situated when their "performance, qualifications, and conduct" are substantially similar "in all material respects." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 274 (7th Cir. 2004) (internal quotations and citation omitted); *see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006) (citation omitted) (stating that the inquiry is a fact-intensive one that requires consideration "of the circumstances as a whole"). That Plaintiff and Patrick were both involved in a confrontation on April 27, 2004 does not establish that they were similarly situated in their employment roles for the purpose of evaluating their relative treatment by their employer, ASP.

Even when viewed in the light most favorable to Plaintiff, there is no basis for finding that Plaintiff and Patrick were similarly situated. Accepting Plaintiff's contentions that, together with Yoksas, Patrick and Plaintiff shared responsibilities as members of ASP's "management team," (Pl.

17

Opp'n (ASP) at 6), it remains undisputed that Plaintiff's title and function differed from Patrick, who was the "Project Manager" and shop supervisor, (Pl. LR 56.1 Resp. (ASP) ¶¶ 75-76). *See Hoffman-Dombrowski v. Arlington Intern. Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir. 2001) (noting that plaintiff and another employee were not similarly situated because they did not hold "the same or equivalent positions"). Among Patrick's tasks as "Project Manager" were technical functions, such as "reviewing and approving material requisitions" and "providing technical assistance for sale [sic] and customers". (Pl. LR 56.1 Resp. (ASP) ¶ 76.) Plaintiff concedes that she was not qualified to perform Patrick's tasks. (Mazeika Dep. at 82-85.) The court concludes that Plaintiff was not similarly situated to Patrick.

Even if Plaintiff and Patrick were similarly situated, Plaintiff cannot establish that ASP treated her less favorably than Patrick. The court accepts Plaintiff's assertion that Rena spoke with Plaintiff about the incident on two or three separate occasions, but prior to terminating Plaintiff, did not speak once with Patrick. (ASP LR 56.1 Resp. ¶¶ 142, 148; Pl. LR 56.1 Stmt. ¶¶ 126, 128.) It is undisputed, however, that Rena did not take any disciplinary action against Plaintiff during these meetings. Indeed, even in Plaintiff's version of events, these meetings were initiated by Rena to help Plaintiff. (Pl. LR 56.1 Stmt. ¶¶ 127, 129–30, 132.) Plaintiff places great emphasis on Rena's alleged statement that she "would never put up with a single woman having an affair with a married man in her company" and that this statement was not made to Patrick. But there is no indication in the record that Rena's statement constituted some form of warning, or even that Rena believed Plaintiff was having such an affair. Plaintiff testified that she "*felt* like [Rena] was pointing the finger" at her. (Mazeika Dep. at 129) (emphasis added). Plaintiff's suspicions are insufficient to support the inference that she was fired because Rena believed she was having an affair with Patrick. *See McDonald*, 371 F.3d at 1001 (citation omitted).

Nor does the court believe that Plaintiff can establish that she received lower pay than similarly situated male employees. With respect to Mr. Scollon, it is undisputed that he had

significantly more experience at the company at the time he was fired in 1999.[21]  He had, at that point, four years' experience as ASP's general manager, compared to Plaintiff's year-and-a-half of accounting experience at the company.  (Pl. LR 56.1 Stmt. ¶ 202; ASP's LR 56.1 Stmt. ¶ 9.)  Plaintiff asserts that she performed "all" the functions that Scollon performed as General Manager after he was fired, but admitted during her deposition that she did not know the full extent of his responsibilities.  (Pl. LR 56.1 Stmt. ¶ 20; Mazeika Dep. at 40-41.)  Many of the tasks Plaintiff describes taking over from Scollon, such as answering phones, distributing mail and ordering office supplies, were purely ministerial.  Furthermore, Plaintiff's assertion that she took over Scollon's obligation to "run the company for the Jahns who were not there" is inconsistent with her further assertion that she shared responsibility for running the company with two other employees—Patrick and Yoksas.  (Pl. LR 56.1 Stmt. ¶ 8;  Mazeika Dep. at 44.)  Nor is the court persuaded that Scollon's relatively high salary is an appropriate benchmark.  After Mr. Scollon left the company, the next highest paid employee, Patrick, earned $14,000 less than Scollon.  (Pl. LR 56.1 Stmt. ¶ 202;  P. Walsh Dep. at 160-61.)  Consistent with the Jahns' testimony concerning ASP's poor financial condition, no one among the company's office staff made as much money as Mr. Scollon after he was fired.  Indeed, Scollon's relatively high salary was itself a substantial cut in pay compared with the salary he was earning before the Jahns purchased ASP.  (ASP LR 56.1 Stmt. ¶¶ 69-70.)  The court concludes that Plaintiff was not similarly situated to Scollon.

Because, as discussed above, the court has found that Plaintiff was not similarly situated to

---

[21]     In a conclusory one-sentence footnote, ASP raises the argument that Plaintiff's claim of a pay disparity with regard to Scollon is time-barred under 42 U.S.C. § 2000e-5(e) and Title VII's claim filing requirements as a result of his termination in 1999.  (ASP Mem. at 3, n.3.)  Defendant responds that ASP has waived the argument by raising it only in a footnote, and that Plaintiff's claim with regard to Scollon's salary is not waived under the continuing violation doctrine as ASP paid Plaintiff less than Scollon until her termination.  (Pl. Opp'n (ASP) at 7, n.2.)  Given the court's finding that the Plaintiff has not made a *prima facie* showing that the pay disparity between her salary and Scollon's salary was discriminatory and the parties' brief attention to the issue, the court does not reach the argument here.

Patrick, Plaintiff cannot establish that Patrick's higher salary was an act of discrimination. Nor is there any genuine dispute that Plaintiff was not comparable in "performance, qualifications, and conduct" to Yoksas. *See Dandy*, 388 F.3d at 274. Even accepting Plaintiff's contention that she shared managerial responsibility with Yoksas, Plaintiff does not dispute that he too performed a different function for the company under a different job title. (Pl. LR 56.1 Resp. (ASP) ¶ 75). *See Hoffman-Dombrowski*, 254 F.3d at 651 (finding plaintiff not similarly situated to individual who did not hold "same or equivalent position"). Yoskas, ASP's "Estimating/Sales Manager," performed specific tasks relevant to ASP's estimating, quotes, and sales, including creating project estimates and acting as a liaison with the company's clients. (*Id.* ¶ 76; ASP LR 56.1 Stmt. ¶¶ 76-77.) Plaintiff concedes that she was not qualified to perform these tasks. (Mazeika Dep. at 82-85.) The court concludes that Plaintiff also was not similarly situated to Yoksas.

That leaves Plaintiff's argument that ASP discriminated against her by paying her less than it paid Mr. Gibbons. Plaintiff's argument that she was similarly situated to Gibbons is a stronger one, but ultimately unconvincing. Gibbons performs all of the accounting functions that Plaintiff performed while she was employed by ASP, (Gibbons Dep. at 6, 10), but the evidence shows he also serves a broader function at ASP in his capacity as "Administrator." In addition to accounting responsibilities, Gibbons is also in charge of "anything related to the network or technology at all in the office," including website development and software development. (*Id.* at 10-11.) Although Plaintiff asserts that she worked with the companies to which ASP outsourced its technology needs and performed some non-technical tasks relating to ASP's computers, she does not claim to have been responsible for all of ASP's technology needs. (Mazeika Aff. ¶ 14.) Plaintiff points out that much of Gibbons' computer training was on the job, but the record shows he had significant experience in this regard. By contrast, Rena viewed Plaintiff's computer skills as deficient and noted this in Plaintiff's employee reviews. (R. Jahn Dep. at 122–25.) After ASP hired Gibbons, he began performing all of ASP's payroll functions in-house. (L. Jahn Dep. at 95.) Although Plaintiff asserts

the court would conclude that perform payroll functions in-house, but was not given the opportunity, it is undisputed that hiring Gibbons allowed ASP to terminate its IT outsourcing arrangement due to his computer expertise. (*Id.* at 94–95; R. Jahn Dep. at 159.) So, even if the court were persuaded that Plaintiff was better qualified to perform ASP's accounting functions, Gibbons plays an additional role at the company that Plaintiff did not fulfill. Plaintiff's assertion that she could have played a greater IT role with additional training, and consequently, *could have been* similarly situated, does not create a material issue of fact. (Mazeika Aff. ¶¶ 9-12.) The court concludes that Plaintiff was not similarly situated to Gibbons.

### *2.* **Pretext**

Because Plaintiff has not established a *prima facie* case of sex discrimination, the court need not reach the issue of pretext. If it were to reach the issue, the court would conclude that the very reasons that Scollon, Patrick, Yoksas, and Gibbons were not similarly situated to Plaintiff—that their performance, qualifications, or conduct differed from that of Plaintiff in the material ways as described above—provide legitimate and non-discriminatory explanations for their higher pay sufficient to shift the burden to Plaintiff to establish pretext by ASP. *See Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005).

A pretext is a "dishonest explanation" or "a lie." *See id.* If an employer "honestly believes" the given reasons for a decision, a plaintiff cannot make a showing of pretext by establishing that a decision was "mistaken, ill considered or foolish." *See id.* Plaintiff's belief that she was more qualified than Gibbons and her assertion that ASP saved only a couple of thousand dollars as a result of her termination, (Pl. Opp'n (ASP) at 10), does not establish a dispute as to whether ASP "honestly believed" its stated explanation for her termination and Gibbon's hiring—that ASP needed to reduce costs and could do so by terminating Plaintiff and hiring someone with broader abilities in order to eliminate ASP's need for accounting and computer outsourcing, (ASP Mem. at 4-6; ASP Reply Mem. 7-8). *See Farrell*, 421 F.3d at 613-15 (noting that plaintiff's opinion that she is more

qualified does not establish pretext).  Plaintiff's belief that the temporal proximity between the April 27, 2004 incident and Plaintiff's termination "point[s] to significant doubt" as to ASP's proffered reasons for her termination, (Pl. Opp'n (ASP) at 11), is also insufficient to establish that ASP's above-described reason was dishonest.  Plaintiff has only speculated that her termination was the result of the April 27, 2004 incident, and her personal belief does not create an issue of fact for the purpose of summary judgment.  *McDonald*, 371 F.3d at 1001 (citation omitted).  Rena's posting of an advertisement in mid-April is also an indication that the Patrick/Renata episode was not a factor in the decision to replace Plaintiff.

Viewing the evidence in the light most favorable to Plaintiff, the court concludes that Plaintiff has not established a *prima facie* case of sex discrimination and grants summary judgment on Count I for Defendant ASP.

## C.     Count II: Sexual Harassment/Hostile Work Environment

To establish a *prima facie* case of hostile work environment sexual harassment, Plaintiff is required to show that:

> "(1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on her sex; (3) the sexual harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) a basis for employer liability exists."

*Phelan*, 2006 WL 2690986, at *7 (citation omitted).  Sexual harassment is actionable under Title VII if it is "'both subjectively and objectively so severe or pervasive'" that it alters the conditions of the plaintiff's employment and creates an abusive work environment.  *Whittaker*, 424 F.3d at 645 (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004)); s*ee Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (stating that both the victim and a reasonable person must perceive the environment as "hostile or abusive").  To determine whether a workplace is objectively hostile, a court must consider the totality of the circumstances, including the frequency and severity

of the discriminatory conduct, "'whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *See Faragher*, 524 U.S. at 787-788 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). Essentially, the actionable workplace is one that is "hellish." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (citation omitted). Harassment by the plaintiff's supervisor, "someone with the power to *directly* affect the terms and conditions of the plaintiff's employment," results in strict liability for the employer.[22] *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505-06 (7th Cir. 2004) (citation omitted). If the harasser is an employee and not the plaintiff's supervisor, the employer is liable if negligent in discovering or remedying the harassment. *Id.* at 506.

Plaintiff contends that she was subjected to unwelcome conduct of a sexual nature by Patrick Walsh, the verbal conduct was based on Plaintiff's sex, the conduct was severe and pervasive such that it created a hostile work environment for Plaintiff, and that ASP should be held strictly liable for Walsh's conduct because of Walsh's supervisory role over Plaintiff. (Pl. Opp'n (ASP) at 15.) ASP contends that Plaintiff cannot establish any of the first three elements of a *prima facie* case for hostile work environment sexual harassment, ASP contends, further, that Patrick Walsh had no supervisory authority over Plaintiff and therefore cannot be held strictly liable for Walsh's actions, and that ASP was not negligent in either discovering or remedying the harassment. (ASP Mem. at 7-9.) The court agrees that Plaintiff cannot establish a hostile work environment sexual harassment.

Drawing all reasonable inferences in Plaintiff's favor, she was subjected to unwelcome verbal conduct of a sexual nature on April 27, 2004 and this conduct was based on her sex. According to Plaintiff, Patrick stated in Plaintiff's office and in Plaintiff's presence that he was "fucking" Plaintiff.

---

[22]     If the employee suffers no "tangible employment action" as a result of the harassment, the employer may raise the affirmative defense that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.

(Pl. LR 56.1 Stmt. ¶ 65-66.)  This statement, given its reference to a sexual relationship, is one of a sexual nature.  The Walsh Defendants' version of the facts, that it was Renata, not Patrick, that referred to a sexual relationship between Patrick and Plaintiff by repeating what Patrick had previously told Renata, does not alter this analysis.  Plaintiff immediately denied the untrue statement, therefore, it is reasonable to infer that the sexual verbal conduct was unwelcome.  (*Id.* ¶ 70-71.)  Again, viewing the evidence in Plaintiff's favor, it is reasonable to infer that the verbal conduct referring to a sexual relationship between Plaintiff and Patrick, a married man, would not have occurred if Plaintiff were not a woman.  This inference is sufficient to satisfy that the harassing conduct was based on Plaintiff's sex.

Plaintiff cannot establish, however, that this conduct was so severe or pervasive that it created a subjectively and objectively hostile workplace.  *See Whittaker*, 424 F.3d at 645.  The court will assume that Plaintiff found the environment at ASP sufficiently hostile to meet the subjective hostility requirement given that Plaintiff was uncomfortable at work after April 27, 2004.  (Mazeika Dep. at 141.)  It is worth noting, however, that Plaintiff herself admits that she "wanted everybody to keep their jobs and keep working," casting doubt on whether Plaintiff actually perceived the work environment to be hostile.  (*Id.* at 144-45.)  She testified, further, that she avoided any contact with Patrick for "a good week"–not a long period of time.

Regardless, the work environment at ASP after April 27, 2004 as described by Plaintiff was far from the "hellish" work environment that the Seventh Circuit requires to establish objective hostility.  *See Perry*, 126 F.3d at 1013.  The harassment at issue was neither frequent nor severe and did not unreasonably interfere with Plaintiff's work, even by Plaintiff's account.  *See Faragher*, 524 U.S. at 787-788.  Though it is unfortunate that Plaintiff felt uncomfortable working with Patrick after the confrontation, it is undisputed that the harassing conduct occurred only once.  (Mazeika Dep. at 143.)  A single act of sexual harassment can be enough to create a hostile work environment, but only if the verbal conduct is egregious.  *See Worth v. Tyler*, 276 F.3d 249, 268 (7th

24

Cir. 2001). In *Worth*, for example, the plaintiff was touched by her supervisor numerous times in a two-day period, including one encounter where her supervisor stuck his hand down her dress and placed it on her breast. *See id.* at 256-57. In contrast, Patrick made one brief statement and, according to Plaintiff, the statement was made in a "normal" tone. (Pl. LR 56.1 Stmt. ¶ 82; Mazeika Dep. at 234.) [23]

Because there is no dispute as to material facts that would affect the court's determination that the environment at ASP in the aftermath of the April 27, 2004 incident was not objectively hostile, the court need not reach the issue of employer liability. The court notes, however, that had Plaintiff met all of the first three requirements of a *prima* facie case, negligence would be the correct standard to apply to determine whether a basis for employer liability exists. No issues of fact exist as to whether Walsh was Plaintiff's supervisor for Title VII purposes. Even assuming that Walsh did set the terms of employment for plant employees (a category that does not include Plaintiff) and Walsh could give Plaintiff instruction, Plaintiff otherwise admits that she and Walsh shared the same level of responsibility as a part of a three-person team that "ran the company" and that she reported only to Loren and Rena. (Pl's LR 56.1 Stmt. ¶¶ 7-8, 38, 41; Pl.'s LR 56.1 Resp. (ASP) ¶¶ 12-13.) In any event, the mere authority to oversee aspects of Plaintiff's work does not qualify Walsh as Plaintiff's supervisor for Title VII purposes. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (finding no supervisory relationship where harasser had the authority to direct plaintiff's work, had input into plaintiff's performance evaluations, and was responsible for training of plaintiff and other less-experienced employees). Plaintiff does not argue that ASP was negligent in discovering or remedying the harassment and the court need not reach the issue here.

---

[23] Even if Rena Jahn believed Plaintiff had been sexually harassed and informed Plaintiff of her opinion, as Plaintiff asserts, (Pl. LR 56.1 Stmt. ¶ 130), Rena Jahn's opinion does not alter that Plaintiff's workplace was not objectively hostile. As a result, the court does not credit Plaintiff's argument that any "meeting of the minds" between Plaintiff and Rena Jahn as to whether Plaintiff was harassed is significant as to whether Patrick's conduct qualifies as sexual harassment under Title VII. (Pl. Opp'n (ASP) at 16.)

Viewing the evidence in the light most favorable to Plaintiff, the court concludes that Plaintiff has not established a *prima facie* case of hostile work environment sexual harassment and grants summary judgment on Count II for Defendant ASP.

**D.     Count III: Retaliatory Discharge**

A plaintiff can prove retaliation under Title VII by two routes—the direct method or the indirect *McDonnell Douglas* burden-shifting approach.  *See Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644, *cert. denied*, 537 U.S. 879 (2002).  **"**Under the direct method, the plaintiff must present direct evidence of: (1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two."  *Rhodes*, 359 F.3d at 508 (citing *Stone*, 281 F.3d at 644).  Under the indirect method, Plaintiff establishes a *prima facie* case of retaliation by showing that she: (1) engaged in a statutorily protected activity; (2) was performing her job in a satisfactory manner; (3) was subjected to adverse employment action; and (4) was treated less favorably than a similarly situated employee who did not engage in the statutorily protected activity.  *See Rhodes*, 359 F.3d at 508 (citations omitted); *Stone*, 281 F.3d at 644.  If the defendant can present a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff must then rebut defendant's reason by showing that it is pretextual.  *See Rhodes*, 359 F.3d at 508.

**1.     *Prima Facie* Case**

Plaintiff contends that she has established a *prima facie* case for retaliation using the direct method pointing to facts that "would allow a jury *to infer* intentional discrimination."  (Pl. Opp'n (ASP) at 18.)  As circumstantial evidence, Plaintiff primarily points to the fact that she complained to the Jahns after the incident with Patrick and was terminated less than a month later.  (*Id.* at 18.)  The Seventh Circuit is clear that temporal proximity between the protected activity and the adverse employment action does not itself create a triable issue.  *See Stone*, 281 F.3d at 644 (collecting

cases).[24]  The other circumstantial evidence that Plaintiff has set forth, that Rena "counseled" her after the incident and not Patrick, is unconvincing given that Plaintiff admits that these meetings were initiated by Rena to help Plaintiff.  (Pl. LR 56.1 Stmt. ¶¶ 127, 132.)  Thus, the court will only consider whether Plaintiff has established a *prima facie* case using the indirect *McDonnell Douglas* burden-shifting approach.  Plaintiff contends that she meets this test by demonstrating that she engaged in a protected activity when she complained of what she perceived to be sexual harassment and that only Plaintiff, and not a similarly situated employee, was subjected to adverse employment action. (Pl. Opp'n (ASP) at 18.)

The court finds that Plaintiff did engage in a statutorily protected activity by complaining about the perceived harassment to Loren.  It is undisputed that Plaintiff called Loren "immediately" after the incident with Patrick and Renata on April 27, 2004.  (Pl. LR 56.1 ¶¶ 120, 122.)  The parties dispute whether Plaintiff told Loren "the whole story," or just that Renata accused Plaintiff of having an affair with Patrick.  (ASP LR 56.1 Resp. ¶ 126.)  Either way, no material issue of fact exists as to whether Plaintiff engaged in statutorily protected activity as Plaintiff's immediate and somewhat "hysterical" recount of Renata's accusation is sufficient to establish that she complained to Loren, her superior, about perceived harassment. (*Id* .¶ 122)  It is also undisputed that Plaintiff talked to Rena about the incident after it happened. (*Id.* ¶ 126)  The parties disagree as to when or how many times Plaintiff and Rena spoke and the exact content of the conversations, (ASP LR 56.1 Resp. ¶¶ 126, 128-32), but the evidence of Plaintiff's conversations with Loren by itself is sufficient to establish a statutorily protected activity.

Although she thus satisfies the first three elements of a *prima facie* case for retaliation,

---

[24]     The cases cited by Plaintiff to support that "time nexus alone is circumstantial evidence enough to enable a jury to render a decision that Plaintiff's termination" was retaliatory, (Pl. Opp'n (ASP) at 18), were not cases where the only circumstantial evidence was evidence of time nexus.  *See Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458-60 (7th Cir. 1994); *Carter v. Enterp. Rent-a-Car Co.*, No. 01-CV-4494, 2002 WL 1759821, *4-5 (N.D. Ill. July 29, 2002).

Plaintiff cannot satisfy the fourth element, as she has not demonstrated that she was treated less favorably than a similarly situated employee who did not engage in the statutorily protected activity. *See Rhodes*, 359 F.3d at 508 (citations omitted); *Stone*, 281 F.3d at 644. As explained earlier, Plaintiff and Patrick were not similarly situated employees of ASP (*see supra* Section B.1), and, even if they were, Plaintiff offers no evidence that ASP's cost-cutting rationale for Plaintiff's termination was a pretext for discrimination. The court grants summary judgment on Count III in favor of Defendant ASP.

**E.    Count V: ERISA Violation**

Section 510 of ERISA makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140. An employee's loss of a benefit as a result of an employer's action is not enough to establish a violation of § 510, and there is no violation if the employee's loss of the benefit was "simply the consequence of a decision that had the incidental effect of affecting an employee's benefit." *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 796 (7th Cir. 2005) (citations omitted). Rather, to establish a claim under this theory, a plaintiff must establish that an employer had the specific intent to deprive the employee of his protected benefits. *Id.* (citation omitted). Where a plaintiff, as here, has not alleged the employer's direct interference with protected benefits, but the plaintiff must proceed by establishing a *prima facie* case that the employer has violated § 510 of ERISA. *See id.*

The Seventh Circuit has defined the elements of such a case as follows: Plaintiff must show that she (1) is a member of the protected class; (2) was qualified for her job; and (3) the circumstances under which she was discharged provide a basis for believing that the employer had the prohibited intent of depriving her of benefits. *See id.* (citations omitted). If the plaintiff establishes a *prima facie* case, the defendant may then present evidence of a legitimate non-discriminatory reason for the discharge. *See Salus v. GTE Directories Serv. Corp.*, 104 F.3d 131,

135 (7th Cir. 1997) (citation omitted). If the defendant can present such a reason, the plaintiff must show that the proffered reason is pretextual and that "the 'motivating factor behind the termination' was the specific intent to interfere with the Plaintiff's ERISA rights." *See id.* at 135 (quoting *Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir. 1991)).

ASP does not dispute that Plaintiff belongs to a protected class and was qualified for her position, but contends that Plaintiff cannot establish ASP terminated her to deprive her of protected health benefits. (ASP Mem. at 14-16.) In response, Plaintiff states only that "the facts show that the circumstances of Plaintiff's discharge provided some basis for believing that the prohibited intent was to deprive [Plaintiff] of her benefits." (Pl. Opp'n (ASP) at 23.) Plaintiff's statement is less than clear as to whether Plaintiff contends that ASP's *specific intent* in terminating Plaintiff was to deprive Plaintiff of her benefits, but the court will assume this is her position.

According to Plaintiff, Loren informed her that ASP would save money on its employee health insurance when employees with health problems were no longer with the company. (Mazeika Dep. at 66.) But it is undisputed that Loren never told Plaintiff that ASP fired any employee specifically to deprive them of benefits or to bring down health insurance costs for ASP. (*Id.*) Even when viewing the evidence in Plaintiff's favor and accepting Loren's statement as true, Plaintiff's contention that employees were fired specifically due to their costly health problems amounts only to Plaintiff's belief. This belief and Plaintiff's unsupported statement that ASP "knew" she had health issues, including a lump in her breast, (*id.* at 67), are insufficient to create an issue of material fact for summary judgment. *See McDonald*, 371 F.3d at 1001 (citation omitted); *see also Singley v. Illinois Midland R.R. Inc.*, 127 F. Supp. 2d 1037, 1047 (C.D. Ill. 2001) (citing *Meredith*, 935 F.2d at 127) (noting that Plaintiff speculated "extensively" but failed to show that the "motivating factor" behind his discharge was employer's specific intent to interfere with his benefits). Plaintiff has not otherwise established that ASP's specific intent in terminating her was to deprive her of health benefits, therefore, Plaintiff has not met the *prima facie* case for a claim under § 510 of ERISA.

Even if Plaintiff could establish a *prima facie* case that ASP violated § 510 of ERISA, no dispute of material fact exists as to whether ASP's explanation for Plaintiff's termination—that ASP cut payroll costs by eliminating Plaintiff's position in favor of a new position encompassing many of Plaintiff's tasks and other tasks that ASP outsourced—was a pretext. (*See supra* Section B.2.) Plaintiff's evidence to counter ASP's explanation consists of only her speculation that she and other employees were fired to reduce the cost of health insurance to ASP. Loren Jahn's alleged comment is insufficient to establish any specific intent to deprive ASP's employees of their health benefits. (Pl. Opp'n (ASP) at 23-24.) The court grants summary judgment on Count V for Defendant ASP.

## F.     Plaintiff's State Law Claims

In view of the courts' finding above that Defendant ASP is entitled to summary judgment on all of Plaintiff's federal claims, this court declines to exercise jurisdiction over Counts IV, VII, VIII, IX, X, XI, XII, and XIII. Each of these counts contain state law claims sounding in tort. "It is the well established law of [the Seventh Circuit] that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). Nothing in the record indicates that "the interests of judicial economy, convenience, fairness, or comity" counsel in favor of this federal court determining state law claims after having granted summary judgment on all federal claims. *See Wright v. Associated Ins. Co. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (citation omitted). Out of "respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law," this court exercises its discretion to decline jurisdiction over Plaintiff's state law claims. Counts IV, VII, VIII, IX, X, XI, XII, and XIII are dismissed without prejudice.

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendant ASP's motion for summary judgment (50) is granted as to Counts I, II, III, and V. The court dismisses Counts IV, VII, VIII, IX, X, XI, XII, and XIII

without prejudice. Plaintiff's Motion to Strike Defendant ASP's Affidavits/Declarations of Rena Jahn and Loren Jahn (68) is granted in part and denied in part. The Walsh Defendants' motion for summary judgment (53) is stricken without prejudice.

ENTER:

Dated:  September 29, 2006

REBECCA R. PALLMEYER
United States District Judge